WILLIAM PHILLIPS *vs.* SIMON VORENBERG.

Suffolk.    December 1, 1926. — April 4, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & SANDERSON, JJ.

*Evidence,* To prove a note attested, Of custom, Presumptions and burden of proof, Relevancy and materiality, Competency, Of value. *Bills and Notes,* Attestation, Interest. *Limitations, Statute of. Practice, Civil,* Exceptions, Order of evidence. *Mortgage,* Of real estate: foreclosure, deficiency after foreclosure. *Surety, Subrogation. Witness,* Cross-examination.

Compliance with the rule of law that, in order to constitute an attestation of a note within G. L. c. 260, § 1, cl. 3, the witness must put his name to it openly and in circumstances which reasonably indicate that his signature is with the knowledge of the promisor and is a part of the same transaction with the making of the note, may be found upon evidence that a signature affixed, under the word "witness" upon a note which on its face stated that it was secured by a mortgage of real estate, was the name of the one who drafted the mortgage, a conveyancer of wide experience, that his name also was appended to the mortgage as a witness, that he as a justice of the peace took the acknowledgment of the maker of the note as grantor in the mortgage, that all signatures

purporting to be his were such, and that the note and mortgage were made contemporaneously:

It was no violation of G. L. c. 231, § 81, for the judge, at the trial of an action involving the question above described, to charge the jury, with respect to the fact that the conveyancer also wrote his name under the word "witness" on the mortgage after the names both of the maker of the note and of his wife, as follows: ". . . the mortgage itself, while it requires no witness to the signatures of the mortgagor and his wife, if his wife has to sign, nevertheless may be witnessed. And the putting on of a witness's name as a witness to the mortgage itself, — the mortgage deed is distinct from the mortgage note, — while it is not necessary, is perfectly proper; and it has no effect upon the mortgage note if there is an attestation of the mortgage deed . . . although there is, as counsel has pointed out to you here, a signature, — possible for you to find an attestation purporting to be that of . . . [the conveyancer] upon the mortgage deed itself."

The admission of evidence at the trial above described, as to a practice or custom of the conveyancer in question "to witness instruments which he prepared," was *held* in the circumstances, even if it were error, to have caused no prejudice to the defendant, and under G. L. c. 231, § 132, an exception to such admission was overruled.

The maker of a note dated in 1904, secured by a mortgage of real estate and bearing interest on its face at the rate of three and three quarters per cent, in 1907 made an agreement with the payee for an extension of three years at four and one quarter per cent, and in 1910 a further agreement, which was evidenced by a memorandum stating, "Extended for three years to July 10, 1913 at 4 per cent (no reduction to be made in rate of interest)." In 1912, he sold the real estate without an agreement by the grantee to assume and pay the mortgage debt, and in 1915 his grantee also made such a sale. By subsequent agreements between successive owners of the equity of redemption and the mortgagee, interest at various times was paid at the rates of four and one half, four, and five and one half per cent to August, 1919. In an action against the original mortgagor for a deficiency remaining due on the note after foreclosure of the mortgage in 1920, the plaintiff disclaimed recovery of interest after August, 1919, at a rate higher than four per cent, and the judge charged the jury that, if they found for the plaintiff, interest at that rate might be recovered. *Held*, that

(1) In computing the amount of the mortgage debt against which the price received at the foreclosure sale was to be credited, interest should be computed at the rates agreed upon from time to time between the mortgagee and the successive holders of the equity of redemption;

(2) The defendant was liable to pay interest upon such deficiency at the rate of four per cent after the last payment of interest by the last holder of the equity of redemption.

At the trial of the action above described, the defendant contended that the mortgagee plaintiff, without the defendant's knowledge or consent, made with the defendant's grantee a valid and binding agreement extending the mortgage of a character which relieved the defendant of any obligation on the mortgage note and left the plaintiff to look to the land

alone for satisfaction of the mortgage debt, or so lessened in value the defendant's right to take over the plaintiff's rights as mortgagee upon payment of the mortgage debt that the defendant should not be held to pay the whole, if any part, of the deficiency.   Evidence of such an agreement was in a notation upon the envelope in which the mortgage and note were kept by the plaintiff's agent, "Renewed for three years from July 28, 1913, at 4½%," and the testimony of the defendant's grantee, "I had one, probably more than one conversation with . . . [the plaintiff's agent], and arranged for, I won't say an extension, I don't recall whether exactly an extension, but I arranged for the mortgage then existing on the property should be allowed to remain but as a part thereof I was required to increase the rate of interest by one half per cent, that is, from four to four and one half per cent.   I cannot tell from memory whether the length of time it was allowed to remain was one year or three years or five.   I should say a definite period was arranged on but I can't say whether one, three, or five, or two and one half, or any other definite time.   After the talk . . . I paid the changed rate of interest . . . ."   The judge left to the jury the determination of the question, whether such a valid and binding agreement was made. *Held,* that

(1) The burden of proof was on the defendant to establish the extension he asserted as a defence;

(2) The question properly was left to the jury, whether there was an agreement for extension, or whether it was only an arrangement that an overdue mortgage might continue to subsist without relinquishing the right of foreclosure if any of the other conditions were unperformed;

(3) The evidence properly was admitted.

At the trial above described, it was proper to exclude evidence that, after the arrangements above described, no request was made on the defendant by the plaintiff for payment of the mortgage, since silence of the plaintiff could not enlarge nor diminish the scope of the alleged agreement.

At the trial of the action above described, it appeared that by the mortgage deed the defendant covenanted and agreed to pay all taxes at any time thereafter laid or assessed upon the granted premises; that, in case of any default in the payment of such taxes, the plaintiff might demand of the mortgagor whatever amount he as mortgagee had been obliged to pay; and that "the entire mortgage debt shall become due after one month's default in the performance of any part of the foregoing condition at the option of the holder or holders."   The notice of intended foreclosure in March, 1920, stated that it was for "breach of condition of said mortgage," and at that time, and at the time of the sale, $2,360 had been overdue as taxes for more than one month.   Besides the arrangement by the owner of the equity of redemption with the plaintiff in 1913 (relied on by the defendant as a binding agreement of extension discharging him, and described above) it appeared that in July, 1918, the successor as holder of the equity of redemption, who had not agreed with his grantor or with the defendant to assume and pay the mortgage note, had accepted a proposal by the plaintiff "to extend this mortgage

for three years, (from August 28, 1918) at five and one half per cent." There was evidence that the value of the mortgaged premises was sufficient to satisfy the mortgage debt until the time of that agreement; there was conflicting evidence on the question whether at any time thereafter and before foreclosure that value was less than the mortgage debt. There also was evidence that previous to the foreclosure taxes had been in arrears at various times during six years, and that in 1914, when they were in arrears, the plaintiff had written to the defendant, who then had parted with the equity of redemption, stating that fact and that foreclosure proceedings were imminent, and that the defendant stated, "The mortgage is good. If the mortgage is good that is the end of it." The defendant contended also that the agreement of July, 1918, relieved him from further responsibility on the mortgage note. *Held*, that

(1) A verdict for the defendant could not have been ordered;

(2) The failure to pay the taxes was a breach of the mortgage warranting the foreclosure in the circumstances;

(3) The failure to pay the taxes was a breach by the defendant of a primary obligation quite apart from that of promisor on the note;

(4) If any loss ensued because of the delay to foreclose for non-payment of taxes after the defendant, to whom the first extension was given, had parted with the equity, he was not entitled to have such loss considered in reduction of the debt since no extension given referred to an extension of the time within which the taxes should be paid;

(5) No reversible error appeared in instructions to the jury in substance that the agreement did not preclude foreclosure for failure to pay taxes during the time of the extension named; that upon the tax at any time remaining overdue for a month, the mortgage might have been foreclosed and that upon any such failure to pay the tax the defendant had had a right to step in, pay the mortgage debt, and take over the right of the mortgagee to foreclose; and that the defendant, having failed upon such occasion or occasions to avail himself of such right, could not set up the extension agreement of July, 1918, as a defence after a foreclosure by the mortgagee which had resulted in a deficit;

(6) It was proper for the judge to leave to the jury the questions, whether any damaging extension agreement or agreements had existed, and whether the amount of deficiency was in whole or in part a result thereof, and if in part, what part, and to instruct them to give to the defendant the advantage of any increase of deficiency caused from damage to his right "to step into the mortgagee's shoes" by paying the mortgage debt and taking over the right to foreclose resulting from a valid and binding extension agreement, if any.

The mortgage above described permitted the plaintiff or his agent to become a purchaser at the foreclosure sale, and evidence therefore was not admissible to show the value of the premises at the time of such a sale to an agent of the plaintiff, the regularity of the sale not being questioned.

At the trial of the action above described, testimony by the defendant and by previous owners of the equity of redemption, none of whom was qualified as an expert or was an owner of the premises at the time of the

trial, was not admissible on the question of the value of the property in 1912, 1913, 1915, 1918, and 1920.

If a defendant, who had been called by the plaintiff, has testified only as to a single subject and his further examination with the permission of the trial judge is suspended until he is called by his own counsel, he cannot be cross-examined as a matter of right by his own counsel when recalled to testify in his own behalf, but must testify as in direct examination; and the judge within his discretion properly may rule that he may be cross-examined by his own counsel only on the subject as to which he testified when called by the plaintiff.

Evidence at the trial above described to show that counsel for the plaintiff, who succeeded former counsel in 1917, was told by such former counsel that the mortgage had been renewed for three years from August, 1915, was inadmissible.

CONTRACT. Writ dated March 27, 1920.

Allegations of the declaration were in substance that the defendant made an attested promissory note, dated January 28, 1904, for $70,000 payable to the order of the plaintiff in three years, bearing interest payable semi-annually at the rate of three and three quarters per cent per annum, and secured by a mortgage of real estate, numbered 151–157 Court Street in Boston; that default in performance of the conditions of the mortgage occurred, and during its continuance the plaintiff on March 26, 1920, sold the mortgaged premises under a power of sale in the mortgage and realized $46,000, which, "after deducting the expenses of said sale and the interest then due, and compensation of the mortgagee, was applied by the plaintiff to the satisfaction of the said debt," and that the defendant still owed the plaintiff the balance of the said note and interest thereon from March 26, 1920, that is, $26,948.64.

The answer, besides a general denial, allegations of payment, denials of genuineness of signatures of the maker and of all witnesses, denial of authority from the defendant to the person who signed as a witness, and also allegations of the statute of limitations, contained the following paragraphs which were the fifth and sixth respectively:

"And further answering the defendant says that if he ever made a promissory note secured by mortgage of real estate and if default in the performance of the condition of said mortgage and sale under the power of sale contained therein

ever occurred, all as set forth in the plaintiff's declaration, the defendant subsequent to the making of said note and mortgage and long prior to said default and sale conveyed away the equity of redemption of said real estate subject to said mortgage and that after the making of said conveyance by the defendant the plaintiff entered into certain valid and binding agreements with the owner or owners of said equity of redemption whereby the plaintiff agreed to certain renewals and extensions of said note and mortgage at rates of interest differing from and greater than that set forth in said note and mortgage and differing from and greater than any rate of interest ever consented to by the defendant, all without the knowledge or consent of the defendant, wherefore the defendant says that he now owes the plaintiff nothing.

"And further answering the defendant says that if he ever made a promissory note secured by mortgage of real estate and if default in the performance of the condition of said mortgage and sale under the power of sale contained therein ever occurred, all as set forth in the plaintiff's declaration, the defendant subsequent to the making of said note and mortgage and long prior to said default and sale conveyed away the equity of redemption of said real estate subject to said mortgage, and after the making of said conveyance by the defendant the plaintiff entered into certain valid and binding agreements with the owner or owners of said equity of redemption whereby the plaintiff agreed to certain renewals and extensions of said note and mortgage at rates of interest differing from and greater than that set forth in said note and differing from and greater than any rate of interest ever consented to by the defendant, all without the knowledge or consent of the defendant, which said renewals and extensions affected the right of foreclosure of said mortgage by extending the time for the payment of the mortgage debt, and the defendant says that whereas at the time said renewals and extensions were entered into and at all times prior to the making of the first of said renewals and extensions the security for said mortgage debt, to wit, said real estate, was more than ample to pay all sums due in connection with said note and mortgage, nevertheless by reason of such renewals

o

and extensions and by reason of depreciation of said security and changes in the market and other conditions, and otherwise, said security and the value thereof before the expiration of said renewals and extensions became and continued to be and was at the time when said default occurred, and at the time of said sale, short of the sums due on said note to the full extent of the balance claimed in the plaintiff's declaration, wherefore the defendant says that he now owes the plaintiff nothing."

The action was tried in the Superior Court before *Fosdick*, J.

Agreements by the defendant as to extensions of the mortgage note and changes in the rates of interest, are described in the opinion. The only evidence as to the last extension procured by the defendant was his testimony that "when the mortgage came due in 1910 I think Mr. Dexter, [plaintiff's attorney at that time], and I arranged for an extension of three years to July 10, 1913, at four per cent"; and a memorandum made by Mr. Dexter on the envelope containing the mortgage, exhibit 7, "extended for three years to July 10, 1913, at four per cent (no reduction to be made in rate of interest)."

It appeared that, after making the note and mortgage described in the opinion, the defendant continued as owner of the property until August 10, 1912, when he conveyed his interest to Mr. Fred L. Hewitt by a deed stating that the conveyance was made subject to a mortgage amounting to $70,000, existing leases and all restrictions of record, and taxes assessed for the current year, but containing no agreement by Mr. Hewitt to assume and pay the mortgage debt.

Evidence relating to arrangements and agreements made between Mr. Hewitt and "the plaintiff's agent" is stated in the opinion.

Mr. Dexter testified that the memorandum on exhibit 7 was in the handwriting of his chief clerk, and that he did not "recall any talk with Mr. Hewitt about the mortgage. I don't remember him in the matter at all." Evidence relating to a letter by the plaintiff's attorney to the defendant as to delinquencies of Mr. Hewitt in payments under the mortgage

note and mortgage, and a telephone conversation between them following the letter, is stated in the opinion.

On August 27, 1915, Mr. Hewitt conveyed the property to Mr. George Fred Williams by a deed stating, "this conveyance is made subject to mortgages and incumbrances of record; also subject to existing leases and restrictions of record, and taxes"; but containing no agreement by the grantee to assume and pay the mortgage debt. Exhibit 7 contained, in the handwriting of Mr. William Ropes Trask, who at the time of the trial was absent from the Commonwealth and could not testify, but who was admitted to have been acting for and in behalf of Mr. Dexter, the memorandum, "Renewed for three years from August 28, 1915, at four per cent, George Fred Williams, owner of equity."

On March 23, 1917, the plaintiff gave Mr. Andrew J. Peters general power of attorney to act for him. On June 21, 1918, Mr. Peters wrote to Mr. Williams as follows: "As attorney for William Phillips, I hold a mortgage of yours on 151 Court Street amounting to $70,000, which will mature on August 28, 1918. I will extend this mortgage for three years at $5\frac{1}{2}\%$ if you wish me to do so. Will you let me know as soon as you make up your mind in the matter?" On July 5, 1918, Mr. Williams wrote Mr. Peters: "The parties in interest would like to have Mr. Phillips mortgage, 151–157 Court St. renewed for three years as you have suggested. They were hopeful for a $5\%$ rate, but will accept your proposal. Your memorandum on the papers will suffice, and a formal renewal is not necessary to be added to your agreement, unless you wish it." Mr. Peters testified that after August 28, 1915, the due dates for interest were changed from January 28 and July 28, to February 28 and August 28.

On January 24, 1920, when interest at the rates stated in the various agreements that previously had been made had been paid to August 28, 1919, but when the taxes for 1919, amounting to $2,360, had not been paid, Mr. Peters wrote to the defendant as follows: "On January 28, 1904, you executed a mortgage for $70,000 covering property # 151–157 Court Street, Boston. The present owners have defaulted, and I am given to understand that the default will not be

made good in the near future. As attorney for Mr. William Phillips, it is therefore my duty to foreclose the mortgage, and I have given instructions to proceed with the foreclosure. My purpose in calling this to your attention is that I presume you might be interested either to take over this property, or to arrange with someone to buy at the foreclosure sale at a price sufficient to cover the mortgage. The mortgage note being witnessed and held by the original payee is still enforceable. Mr. Clark of my office is looking after the details of this matter for me, and will be very pleased to confer with you at any time."

The defendant replied, referring Mr. Peters to his attorneys, who wrote Mr. Peters on January 31, 1920: "Mr. Simon Vorenberg has handed to us your favor dated Jan. 24th with reference to a mortgage for $70,000, on the property at 151–157 Court Street, Boston, Mass. We shall appreciate it if you will be good enough to let us know the date set for any foreclosure sale, giving us a copy of the advertisement, and will you also let us know as soon as possible the amount of the mortgage with charges thereon to date?" Again on March 23, just before the foreclosure sale, the defendant's attorneys wrote to Mr. Peters a letter as follows: "In connection with the mortgage held by William Phillips on the property at 151–157 Court Street, Boston, Mass., you will remember that at the time this matter was taken up before you were going to send me a letter stating, in case Mr. Vorenberg decided to bid at the foreclosure sale, just how much money would need to be bid in order to relieve him of any possible liability on the note."

On February 3, 1920, an entry for the purpose of the foreclosure of the mortgage "for breach of the condition thereof" was made. A certificate of such entry was recorded on March 4, 1920. On March 3, 1920, advertisement of a notice of a foreclosure sale to take place on March 26, 1920, "for breach of condition of said mortgage deed" was begun. On March 26, 1920, the sale took place and deeds of conveyance were made. The affidavit of Mr. Peters, as attorney for the plaintiff, stated that the default had been made "in the payment of the interest and taxes."

There was evidence that the value of the property was ample to cover the mortgage until the extension was made in 1918. The assessed value in 1916 and 1920 was $100,000. There was evidence that the value in August, 1918, was between $50,000 and $55,000, and that the value increased to 1920. The defendant testified that the value of the property was always more than the mortgage debt.

During the presentation of the plaintiff's case, he called the defendant for testimony on the single question, whether he authorized certain counsel to act for him in connection with the mortgage matter in issue. With the permission of the judge, the examination of the defendant by his own counsel then was suspended until the defendant's counsel should put him on the stand. When the defendant's counsel called the defendant in his case he desired to cross-examine him, but the judge, subject to exception by the defendant, ruled "that he could be cross-examined, for what the plaintiff had put him on for and for no other purpose."

Other material evidence and exceptions by the defendant to rulings on the evidence are described in the opinion. At the close of the evidence, the plaintiff moved to amend his declaration so that the amount, claimed by him to have been rightfully charged, as interest due on the mortgage, against the amount received at the foreclosure sale should be $611.52 less than that stated in the declaration. The judge denied the motion. The plaintiff's counsel then stated: "In order that there may be no error, the item of $2,213.74, as it appears in the plaintiff's declaration, as interest from August 29, 1919, to March 26, 1920, is disclaimed. That was figured at five per cent. What we claim is four per cent from August 29, 1919, to March 26, 1920, which is $1,602.22. In other words, there is a disclaimer of $611.52 interest up to the foreclosure."

At the close of the evidence, the defendant moved that a verdict be ordered in his favor. The motion was denied. He then asked for the following rulings, among others:

"6. There is no evidence that the defendant saw Mr. Sawyer sign his name to that note.

"7. There is no evidence that the defendant knew that Sawyer signed the note as a witness."

"11. If on any occasion after the defendant conveyed the property the plaintiff or his agents or attorneys agreed with a subsequent owner of the property, without the consent of the defendant, for the payment of a rate of interest on the mortgage note greater than three and three quarters per cent, then the defendant is not liable.

"12. If on any occasion after the defendant conveyed the property the plaintiff or his agents or attorneys agreed with a subsequent owner of the property, without the consent of the defendant, for the payment of a rate of interest on the mortgage note greater than four per cent, then the defendant is not liable.

"13. If at the time of any subsequent extension of the time for the payment of the note and mortgage, after the defendant had conveyed away the mortgaged premises, made without his consent, the mortgaged premises were of a value equal to the note or mortgage the defendant is not liable.

"14. The defendant is not liable on the note for any rate of interest in excess of three and three quarters per cent. If the mortgagee collected more than three and three quarters per cent upon the mortgage note from any subsequent holder, the defendant is entitled to have the amount of such excess of interest credited on account of the principal of the note."

"16. If at the time of the foreclosure the mortgagee had received in the aggregate interest at the rate of three and three quarters per cent sufficient to have paid the interest to the then date of foreclosure, then as between this plaintiff and the defendant there was no default in the mortgage.

"17. If at any time subsequent to the conveyance by the defendant of the mortgaged property an agreement was made with a subsequent owner extending the time of the mortgage without entering into such a binding agreement with such subsequent owner as to make such subsequent owner personally liable on the transaction, then in that event such agreement operates as a discharge of liability on the part of the defendant."

"23. If at the time of the foreclosure there was no interest due on the note and mortgage which was in arrears and in default according to the original terms of said mortgage, the mortgage could not be foreclosed for nonpayment of interest.

"24. In determining whether any interest was in arrears or in default under the terms of the mortgage and note at the time of the foreclosure, the jury should calculate the interest on the sum of $70,000 at three and three quarters per cent for said period irrespective of the subsequent agreements increasing the rate of the interest to which Mr. Vorenberg was not a party.

"25. If the aggregate payments received by the mortgagee at the time of the foreclosure for interest were equal to three and three quarters per cent on the principal sum of the mortgage and note up to that time the interest was not in default or in arrears irrespective of agreements between the subsequent purchasers increasing the rate of interest, Vorenberg not being a party to the subsequent agreements.

"26. If the aggregate of the payments of interest after the sale by Vorenberg equalled or exceeded the amount equivalent to interest at the rate of four per cent per annum on $70,000 during the period from the time he sold the property to the time of attempted foreclosure there was no default in the payment of interest, so far as Vorenberg was concerned.

"27. The undisputed evidence shows that after Vorenberg sold the property the mortgagee received payments of interest in the aggregate amounting to $21,612.50 which is an average rate slightly in excess of four per cent per annum for said period.

"28. If in the foreclosure sale the property was sold subject to all unpaid taxes, then the purchaser assumed such taxes.

"29. If the foreclosure was made on the alleged ground that both interest and taxes were in arrears, and if in fact the interest was not in arrears, then said foreclosure was null and void as between this plaintiff and the defendant so far as charging the defendant for any deficiency arising out of said foreclosure sale.

"30. In order to recover against the defendant on the note the burden of proof is on the plaintiff to show that after

the defendant conveyed the property the obligation of the mortgage and note continued without change in its terms throughout the period subsequent to such conveyance up to the time of foreclosure.

"31. In order to recover against the defendant on the note the burden of proof is on the plaintiff to show that the mortgage security was not by agreement of the mortgagee and a subsequent owner of the property made subject to greater obligations than those to which the defendant agreed; that is to say, if the mortgagee and subsequent owner of the equity made an agreement by which the security was made subject to a greater rate of interest it operates to release the defendant.

"32. In order to enforce any liability against the defendant the burden of the proof is on the plaintiff to show that at no time after the conveyance of the property by the defendant the mortgagee entered into any binding agreement with a subsequent owner by which the time of payment was extended or the rate of interest increased."

"35. Where an agreement is made to renew a mortgage for three years it means that a contract is entered into by which the time of payment of the mortgage is postponed.

"36. The dates of the payments of taxes assessed on the mortgaged premises are immaterial."

These rulings were refused.

Besides giving the instructions stated in the opinion, the judge, so far as material to these exceptions, charged the jury in substance as follows:

"Did George A. Sawyer, whose name purports to be here, sign this note? Is that the signature of George A. Sawyer? The second question is, Did George A. Sawyer put that signature on that note under such circumstances that it constitutes a real, true, valid and lawful attestation of the signature of Simon Vorenberg, or S. Vorenberg, to that note? The law says, — and you can see how sensible the law is, that if the putting on to a promissory note the name of an attesting witness makes that note suable for twenty years instead of six years, that the putting on of an attesting witness's signature is a matter of considerable moment to the man

who might be sued if the note were not paid. And you can see that that is particularly true in the case of a note secured by a mortgage of real estate where the person who is making a note and who at the time of the making of the note owns the property, may at any time later sell the property subject to the mortgage and wait or hope thereby and expect, possibly thereby, to be relieved from the payment of the note which he has made. So that the affixing of an attesting signature to a note is a matter of moment, and it is a matter of so much moment that the law says it must be done with the knowledge and consent of the maker of the note, openly. That means of course, — because if it is done in secret the maker of the note knows nothing about it, and it must be done with the knowledge and consent of the maker. It need not be requested by the maker of the note if he knows about it, knows that it is being done and knows that the person who signs as a witness has seen him, the maker, signing the note, then that is enough to satisfy the law.

"The mortgage, itself, while it requires no witness to the signatures of the mortgagor and his wife, if his wife has to sign, nevertheless may be witnessed. And the putting on of a witness's name as a witness to the mortgage itself, — the mortgage deed is distinct from the mortgage note, — while it is not necessary, is perfectly proper; and it has no effect upon the mortgage note if there is an attestation of the mortgage deed . . . although there is, as counsel has pointed out to you here, a signature, — possible for you to find an attestation purporting to be that of George A. Sawyer upon the mortgage deed itself."

"The defendant claims that the arrangement made . . . [between his the plaintiff's representative and Mr. Hewitt] was a valid and binding agreement, whereby there was charged an increased amount of interest, and whereby the payment of the principal sum of the mortgage was postponed. The plaintiff claims that there was no valid and binding agreement at that time, as I understand it, but merely that at that time there was an arrangement which did not, in fact, put off the date when the mortgage principal should be and could be called and made payable. Now, there is the square

issue between the parties at that point of the case and at that stage of the proceedings . . . . And if there were no mutual valid and binding agreements in connection with the transaction between Mr. Hewitt and the plaintiff's representatives here, or if there were no such arrangement between the owner of the equity at a later time and the plaintiff's representatives here, then the matter of a valid agreement passes right out of the case, and I will tell you later on the effect of that. But if there were valid agreements here, then, depending upon what the agreements were, they have an effect upon this case or they have not. . . . " After commenting on the rule of law, that the original mortgagor, in case of a breach of the mortgage by a subsequent holder of the title in the circumstances of this case, would have a right to require the holder of the mortgage to accept payment of the mortgage debt, and the further right then to step into the mortgagee's shoes and to proceed against the land in foreclosure proceedings, the judge continued: "So you see, . . . how the making of a valid and binding agreement for the postponing of the time of payment of the mortgage debt, between the mortgagee and the owner of the equity, if that is the second owner of the equity, not the original mortgagor, may affect the liability and the rights of the original mortgagor. You can see how his right might be affected because if there were such a valid and binding agreement then the original mortgagor, when he had paid his mortgage debt to the mortgagee and had taken over the mortgage rights, would have to take them facing the proposition that since he stood in the shoes of the original mortgagee and had the mortgage he would have to take those shoes, so to speak, subject to impediment. . . .

"It is all a question of fact, so far as you are concerned, although of course you will have to apply to the facts the law I am giving to you. But you have to ask yourself in this case first: Was there any valid and binding agreement such as I have described to you, between Mr. Phillips or his representatives . . . as mortgagee, after the mortgage debt had become due, and the owner of the equity, whether it be Mr. Hewitt or somebody else, such that the situation was that the time of the payment of the mortgage debt was shoved

along?   Was there any such agreement?   If there was not any such agreement, then this particular phase of the case, except for the agreement that was conceded was made between Mr. Peters as representing Mr. Phillips and Mr. George Fred Williams as owner . . . you can leave those things out, as far as extreme or vital importance in the case is concerned, unless they bear upon your view of the transactions after that in some proper way.   In other words, if there were no valid and binding agreements for the postponing of the time of the payment of the principal of the mortgage, between the plaintiff on the one hand and the owner of the equity on the other, Mr. Vorenberg, on the other,— the particular defense that is relied on here is of no consequence.

"Now, it is conceded that there was a valid and binding agreement for the postponing of the mortgage debt, the postponing of the due date of the payment of the mortgage debt, between Mr. Peters, representing the plaintiff, and the owner of the equity at that time, Mr. George Fred Williams. And so we have to consider the situation as it existed then with reference to the defense that is made here, and we have to consider the possible effect of earlier valid and binding agreements (which you are warranted in finding, but by no means compelled to find on the evidence,— according as the truth is you will find it or not, of the kind I have spoken of) [upon the right of the original maker of the note to pay the obligations and step into the shoes of the mortgagee as to the land].   That right, you will see might be seriously affected in its value or, of course, it might not be affected at all in its value, by any such binding and valid agreement to which he was not a party between the mortgagee and the owner of the equity. . . .   Well now, under those conditions, the law says if that right to pay up and step into the shoes of the mortgagee is damaged and if there proves to be a deficit in the mortgage foreclosure whereby the mortgaged property, on foreclosure, doesn't bring the face or amount due under the mortgage note and there is a deficit, then if there is a suit against the maker of the note, the original mortgagor, on that mortgage note, and for that deficit, he has a right to say, 'You, Mr. Plaintiff, Mr. Mort-

gagee, by your valid and binding side agreement to which I was not a party, prejudiced and damaged my rights in the premises to an appreciable extent.' And he has a right to say, and to prove if he can, that the damage was such that his rights have been made valueless to him and amount to nothing in money. Now, there is the situation. Because if it should be found by the jury that there were valid and binding agreements of a nature such as I have described and of such an effect that they did damage or harm to the defendant's rights to step into the shoes of the mortgagee in the manner in which I have described in this case, then, if there is a deficit of the mortgage note, and if there is damage to his rights, he has a right to set off against the liability for the deficit of the mortgage note every bit and every cent's worth of damage, if any, that was done to his rights by the making of the side agreement."

"It is conceded there was one [of the valid and binding agreements previously described] made in 1918, I think, by Mr. Peters acting for the plaintiff and Mr. George Fred Williams, then owning the equity. If that had any effect upon any right of the defendant, such as I have spoken of, then it should be taken into account by you in assessing damages in determining what, if anything, should be paid by the defendant to the plaintiff."

The judge ruled in substance that the items claimed as proper parts of the mortgage debt to be charged to the defendant, as stated in the plaintiff's declaration, "if you find them to be correct in the figures," are proper charges to be made "with one exception that the plaintiff has disclaimed so large an amount of interest unpaid up to the time of foreclosure as is charged him and the plaintiff has disclaimed such portion of that and now claims instead of there being $2,213.74 that was unpaid and that should be charged against this defendant, the plaintiff now says that that is error and that that figure should be, instead of $2,213.74, $1,602.22."

After a recess and a conference with counsel, the judge further charged the jury that "as for so called alleged valid and binding agreements made after he [the defendant] parted with the property, after he deeded his equity of redemption

to Mr. Hewitt, and from then on, . . . the valid and binding agreements on the part of the mortgagee, made, if there were any made subsequent to 1910, if they were not made by Mr. Vorenberg, were agreements on the part of the mortgagee not to exercise his right to foreclose by reason of the fact that the principal of the mortgage debt had not been paid and although that remained due; and on the part of the owner of the equity who had not been a party to the mortgage transaction as a contract, that he, the owner of the equity, would himself perform the condition put upon the original mortgagor by the contract of the mortgage as specified in the mortgage deed. . . .

" The mortgage deed, which you will have with you, provides that the mortgagor shall keep the taxes paid on the premises. The words are 'and until such payment [meaning the payment of the mortgage debt of $70,000] shall pay all taxes . . . upon or in respect of the granted premises or any interest therein.' That is the portion of the mortgage deed in which the then mortgagor, Mr. Vorenberg, agreed to keep those taxes paid. And the mortgage further provided in substance and effect that if the taxes were not kept paid it was to constitute a breach of the condition of the mortgage sufficient to justify the mortgagee in foreclosing the mortgage. And there was a further agreement in the mortgage deed which was to this effect: That the parties to this debt, the mortgagor and the mortgagee, agreed 'that the entire mortgage debt shall become due after one month's default in the performance or observance of any part of the foregoing condition at the option of the holder or holders hereof.'

"The payment of the taxes was a part of the condition of the mortgage. If the taxes were not paid that constituted a breach of the condition of the mortgage which would justify foreclosure and if that default in the payment of taxes continued for one month, then the holder of the mortgage debt, the owner of the mortgage debt, — in this case this plaintiff, would have the option to foreclose the mortgage on that basis, that is, on the basis of a default in the payment of taxes, even though he had made a valid and binding agreement that he would not foreclose for three years, we will say,

or for any term of years or time, by reason of the nonpayment of the principal of the mortgage. In other words, if the mortgagee had said to the owner of the equity: 'I won't foreclose on you by reason of your not paying the $70,000 during the period of three years, but you have in this new agreement that you have made with me, (provided that there were such a one made,) agreed that you will perform all the other conditions of the mortgage. Among those is the condition you will keep the taxes paid; when I agree with you not to foreclose if you will perform all the other conditions of the mortgage, I agreed only that I will not foreclose by reason of any nonpayment of the full amount of the mortgage debt. You fail to perform any of the other conditions of the mortgage at your own peril of foreclosure.

"Now, with that state of affairs, you will see that if it is true that there were valid and binding agreements of that nature between Mr. Hewitt or anybody who followed him in title, namely, Mr. Williams, and if that agreement was to the effect that the mortgagee agreed not to foreclose if the $70,000 was not paid within three years or two years or whatever, — but if that agreement also said: 'I am holding you, Mr. Owner of the equity,' — that is if the mortgagee said to the holder of the equity in effect, 'I am holding you to perform all other conditions of the mortgage and that includes paying your taxes on time, and if you don't pay your taxes that is a condition that I have not barred myself from enforcing by foreclosure by these agreements' — well, now, the application of that to this particular case comes here: that the defendant's defense in this particular is based upon a claim that his right to put himself in the shoes of the mortgagee has been changed by reason of one or more valid and binding agreements whereby the mortgagee agreed not to foreclose if the principal sum of the mortgage were not paid within the time of that agreement, — named in that agreement . . . . Even if there were such agreements concerning the failure to pay the principal sum of the mortgage within three years, nevertheless, here was an actual breach of the mortgage, they claim, the plaintiff claims, in the fact that the taxes were not paid. And that gave the mortgagee the

right to foreclose for nonpayment of taxes even though he had agreed not to foreclose for nonpayment of the full mortgage debt.  And the plaintiff says there was nothing during the existence, — if they were in existence, — there was nothing in the fact or in the situation, if these defaults in payment of taxes existed, to prevent the mortgagor, — that is the original mortgagor, this defendant, Mr. Vorenberg, — from going to the mortgagee and saying: 'Here, my security here that I would be entitled to is going down in value all the time and I wish to be relieved from the possibility that I may be held liable for any deficit if there is a foreclosure and the property doesn't bring the full amount of the mortgage note.  I have the right to pay off this mortgage to you and I hereby tender you the payment of this mortgage, entirely, and with that payment to you I step into your shoes. Your shoes now leave you, or stand you, in a place where you have a breach of the mortgage that you could foreclose for nonpayment of taxes and you haven't agreed not to do that. I want to step into your shoes, I am buying my way into your shoes by exercising my right to pay off this mortgage debt which has been due and payable for some time.   Here is the money, take it, cancel my liability in this matter to you, because here is the money to do it with; I now step into your shoes; I now have a right to foreclose in your stead, this mortgage, and save myself what I can by foreclosing now before the value of it goes any lower, before the value of the security, the land, goes any lower.'

"That is what the situation would be under those conditions.   Now, if the mortgagor, Mr. Vorenberg in this case, having that possibility before him, doesn't take advantage of that possibility, he can't come into court here and claim he has been harmed by carrying the thing along, by not taking advantage of the possibility that he had and the right that he had when he could have saved himself harm.   That is the way in which the tax situation is important, because if those taxes were not paid, then there was a breach of the condition of the mortgage.   The mortgage debt could have been paid at any time after 1913, — I take it, any time after 1913 the mortgage debt could have been paid by the mortgagor and

he could have compelled the mortgagee to take the mortgage debt in full at any time after 1913 regardless of any side agreement. And if that was so and he didn't do it and if there were defaults there in the payment of taxes which would have enabled him if he had paid the mortgage debt to step into the shoes of the mortgagee and he didn't take any advantage of that situation, he can't take any advantage of it now when the foreclosure has gone by and the foreclosure has taken place, of any deficit that did show up when the foreclosure did take place. . . .

"And if you find that the plaintiff on this last aspect of the case is entitled to recover the deficit or a part of it, then the question of damages comes down to this: Was there any injury done to the plaintiff's [*sic*] right to foreclose, that is, to step into the shoes of and pay off the mortgage debt of the mortgagee and step into the mortgagee's shoes and save any further depreciation of the land value security by foreclosing at once or insisting upon payment to him at once? Was there any damage to that right by any of the features of the so called valid and binding agreement? If there was no damage and if there has been no payment of the note and if the note was a duly attested note and is not barred by the statute of limitations, then, there being no damage, the defendant would be liable to the plaintiff for the full amount of the deficit as it actually was, with interest at four per cent down to the time of this trial and down to the time of your verdict. If there was injury done to the rights of the defendant, and if he is otherwise, then for that injury, obliged to pay this deficit, if there was one, entitled to be given credit of the amount he ought to pay here for the dollars and cents value of the injury done to his rights and if he would be otherwise obliged to pay any deficit here and if the injury to his rights has been so great that the dollars and cents value of it equals or exceeds the amount of the deficit he otherwise should have to pay, you should find a verdict for the defendant here because his credits have wiped out his debt and that is the way it stands on the question of damages. . . .

"In my charge I have perhaps in more than one place spoken of the matter of unpaid taxes, and I said there was

evidence from which you would be warranted in finding there was a continuous default in the payment of taxes. Disregard the question of continuous default and never mind what I have said about there being a continuous default, or not. The existence of the default, if there was any, is a question of fact for you to decide on the testimony. If there were defaults in the payment of taxes then so long as those defaults existed they were cause for foreclosure."

The defendant by specific reference excepted to portions of the charge inconsistent with his requests for rulings above set out.

The jury found for the plaintiff in the sum of $31,881.93. The defendant alleged exceptions.

*Lee M. Friedman,* (*P. D. Turner* with him,) for the defendant.

*J. L. Hall & M. Jenckes,* (*A. J. Peters & H. L. Clark* with them,) for the plaintiff.

BRALEY, J. On January 28, 1904, the defendant borrowed of the plaintiff $70,000 for which he gave his promissory note, payable in three years from date with interest at three and three quarters per cent semi-annually, secured by a mortgage with power of sale, upon default, on his real property with buildings thereon numbered 151–157 Court Street in the city of Boston. The jury could have found that the conditions of the mortgage were broken; that foreclosure followed on March 26, 1920; that a deed under the power was duly executed and delivered to the purchaser; and that the affidavit required by G. L. c. 244, § 15, was seasonably executed and recorded. It also could have been found that the purchase price of $46,000, after deducting the foreclosure expenses, was insufficient to satisfy the mortgage, and the present action is brought to recover an alleged deficiency of $26,337.12 with interest.

The first ground of defence is, that the action is barred by G. L. c. 260, § 2, because not brought within six years after the cause of action accrued. It is, however, provided by G. L. c. 260, § 1, cl. 3, that if a promissory note is signed in the presence of an attesting witness an action may be maintained by the original payee if brought within twenty

years from the date of maturity. The note in question purports on its face to be signed by the defendant as maker, with the word "Witness" in print, and the words underneath "Geo. A. Sawyer" appearing at the left of the defendant's signature. While the defendant denied the genuineness of these signatures, and required their proof at the trial, (G. L. c. 231, § 29,) there was plenary evidence that the respective signatures were genuine. "In order to constitute an attestation of a note, within the statute, the witness must put his name to it openly, and under circumstances which reasonably indicate, that his signature is with the knowledge of the promisor, and is a part of the same transaction with the making of the note." *Drury* v. *Vannevar*, 1 Cush. 276, 277. The question of what is competent evidence to establish this fact was considered in *Tompson* v. *Fisher*, 123 Mass. 559, 560, where the person whose name purported to be upon the note as an attesting witness testified at the trial, that "the name looked like his handwriting, that he thought it was; that he could not tell under what circumstances it was put there; that he had no recollection whatever about it; that, if he signed it, he must have seen the defendant sign." It was held that, although the burden of proof was on the plaintiff, there was some proof of the due attestation of the note. It appears in the case at bar that Mr. Sawyer had died prior to the trial. But there was evidence that he drafted the mortgage which was executed by the defendant to whose signature his name appears as a witness, and he also as a justice of the peace took the defendant's acknowledgment that the mortgage was his free act and deed. It also could be found, that all these signatures, purporting to be his, were in his handwriting, and that the note and mortgage were contemporaneous. We are therefore of opinion that under all the circumstances this question was for the jury to whom it was submitted under instructions which did not as the defendant contends violate G. L. c. 231, § 81. The error of permitting the plaintiff to introduce evidence as to the practice or custom of Sawyer, a conveyancer of much experience, "to witness instruments which he prepared," if it be an error, (see *Mumford* v. *Coghlin*, 249

Mass. 184, 188,) caused no injustice to the defendant. *Adams* v. *Dick*, 226 Mass. 46, 57.    G. L. c. 231, § 132.

The interest during the period from January 28, 1904, to July 28, 1912, was paid by the defendant either at the rate stated in the note or at an increased rate agreed upon by the parties.    The defendant while the owner of the equity of redemption had the mortgage extended in 1907 at four and one quarter per cent and it was again extended on July 28, 1910, at the rate of four per cent, and until further changed by agreement, this rate was the rate payable by the defendant.    The instructions to the jury on the question of interest if the plaintiff recovered were correct.    The defendant however on August 10, 1912, conveyed the equity to Fred L. Hewitt subject to the mortgage, existing leases, restrictions, and taxes assessed for the current year.    But the deed did not contain a clause that the grantee assumed and agreed to pay the mortgage, and this transaction did not of itself discharge the defendant.    *Codman* v. *Deland*, 231 Mass. 344.    The deed not only was recorded, but the plaintiff had actual notice of the change in title as well as the subsequent conveyance on August 27, 1915, from Hewitt to George F. Williams, who was the owner at the date of the foreclosure and who acquired title under the same conditions as stated in the deed to Hewitt.    There was evidence that the interest paid by Hewitt was at the rate of four per cent from July 28, 1912, to July 28, 1913, and four and one half per cent from July 28, 1913, to August 28, 1915, and that after the conveyance to Williams, the rate was reduced to four per cent from August 28, 1915, to August 28, 1918.    The interest thereafter paid by Williams was at the rate of five and one half per cent from August 28, 1918, to August 28, 1919. The plaintiff by his agent wrote the defendant August 12, 1914, when Hewitt owned the equity, that the taxes for 1913 were unpaid and the interest on the mortgage was in arrears and that foreclosure proceedings would be begun.    The defendant replied in a telephone conversation that "the mortgage is good."    "If the mortgage is good, that is the end of it."    But no attempt to foreclose followed.    The defendant at the date of the conveyance to Hewitt was the

promisor. If he became a surety with the land as principal, the transformation must have been wrought after he parted with his title to the equity. While an agreement for extension need not be in writing, *Brooks* v. *Wright*, 13 Allen, 72, 76, the deed to Hewitt as previously said conveyed the land by express terms subject to the mortgage, and the grantee did not thereby assume and agree to pay the debt, and he did not assume it by implication. *Fiske* v. *Tolman*, 124 Mass. 254, *Rice* v. *Sanders*, 152 Mass. 108. The defendant under the sixth paragraph of his answer introduced evidence to show a valid and binding agreement between Hewitt and the plaintiff, whereby the mortgage was extended, and consequently the defendant became discharged as a surety, leaving the mortgagee to look to the land alone for payment of the debt. *North End Savings Bank* v. *Snow*, 197 Mass. 339. See *Codman* v. *Deland, supra,* page 347. The burden of proof was on the defendant to establish the extension. *Haydenville Savings Bank* v. *Parsons*, 138 Mass. 53. The only evidence consisted of an entry on an envelope in which the mortgage and note were kept. It reads as follows: "Renewed for three years from July 28, 1913 at $4\frac{1}{2}\%$," and the testimony of Hewitt, "I had one, probably more than one conversation with . . . [the plaintiff's agent] and arranged for, I won't say an extension, I don't recall whether exactly an extension, but I arranged for the mortgage then existing on the property should be allowed to remain but as a part thereof I was required to increase the rate of interest by one half percent, that is, from four to four and one half per cent. I cannot tell from memory whether the length of time it was allowed to remain was one year or three years or five. I should say a definite period was arranged on but I can't say whether one, three, or five, or two and one half, or any other definite time. After the talk . . . I paid the changed rate of interest . . . ." It was for the jury, under suitable instructions which were given, to decide on the evidence, all of which was admissible, notwithstanding the defendant's exceptions, whether there was an agreement for extension, or whether it was only an arrangement that an overdue mortgage might continue to subsist without re-

linquishing the right of foreclosure if any of the other conditions were unperformed.  *Lewis* v. *Blume,* 226 Mass. 505.

The offer of the defendant to prove that after the arrangement, no request was made on him by the plaintiff for payment of the mortgage, was properly excluded.  The silence of the plaintiff could not enlarge nor diminish the scope of the alleged agreement.

The agreement of the mortgagee with Williams for "renewal" of the mortgage for three years from August 28, 1918, with interest payable at five and one half per cent is apparently recognized by the plaintiff as binding.

It however appears on the face of the note that it is secured by a mortgage of real estate duly recorded, and by the mortgage deed the defendant among other conditions covenanted and agreed to pay all taxes at any time thereafter laid or assessed upon the granted premises, and in case of any default in the payment of such taxes the mortgagee may demand of the mortgagor whatever amount he has been obliged to pay.  It is further agreed, that "the entire mortgage debt shall become due after one month's default in the performance of any part of the foregoing condition at the option of the holder or holders."  The notice of the time and place of sale, stated that the premises were to be sold for "breach of condition of said mortgage."  It is stated in the record that at the date of sale, which was attended by the defendant, the taxes unpaid amounted to $2,360 for the year 1919, subject to which the property was sold.  The failure to pay the taxes was a breach of the mortgage warranting the foreclosure.  *Silva* v. *Turner,* 166 Mass. 407.  The deeds to Hewitt and Williams merely show that they purchased the equity of redemption, and, while interested in payment of the mortgage which was an encumbrance on the land, they entered into no contract to pay the debt or the taxes, and when Hewitt conveyed to Williams his interest ceased.  Williams, the last owner of the equity, who lost his interest by the foreclosure, was in a similar position.  The failure to pay the taxes was a breach by the defendant of a primary obligation quite apart from that of a promisor on the note.

The defendant must be presumed to have known of the terms of the mortgage and he could have protected himself from the contingency of loss by reason of unpaid taxes by a suitable clause in his deed to Hewitt, assented to by the mortgagee. *Codman* v. *Deland, supra.*

If any loss ensued because of the delay to foreclose for nonpayment of taxes after Vorenberg, to whom the first extension was given, had parted with the equity, he is not entitled to have such loss considered in reduction of the debt. The rights of the defendant under the extensions, whether arising from contract or resting on subrogation, were subject to the paramount right of the plaintiff to foreclose if the taxes were not paid, and to collect from him any resulting indebtedness. *American House Hotel Co.* v. *Hemenway,* 237 Mass. 180. *Greene* v. *Richards,* 244 Mass. 495.

The plaintiff deducted from the price received at the foreclosure the amounts paid for the services of an auctioneer, the cost of revenue stamps, and of publication of the notice of foreclosure, counsel fees, and compensation to the mortgagee. The compensation to the mortgagee was authorized by the default clause of the mortgage, and it was for the jury, to whom the question was submitted, to determine whether the charges were reasonable. *Bangs* v. *Fallon,* 179 Mass. 77.

The defendant's contention, that he is not bound by the foreclosure because the total payments of interest at the rates appearing in the record from the date of the sale to Hewitt and until foreclosure show no default, cannot be maintained for reasons sufficiently stated.

The further argument, that as one Clark, the purchaser, bid in the property for the plaintiff, the defendant could introduce evidence of its value at that time, cannot be maintained. The power authorized the plaintiff or his agent to bid, and the defendant is bound by the sale, the amount of which was credited, subject to any deduction the jury might find if the expenses of the foreclosure were excessive. *McCarthy* v. *Simon,* 247 Mass. 514.

The parties introduced evidence as to the fair value of the property at the date of the respective extensions. But the defendant's offer of proof that Hewitt would testify that

the fair value in 1912 and 1914 was in excess of $100,000, and Vorenberg would testify that in 1912, 1913, 1915, 1918 and 1920 its fair value was in excess of $70,000, was excluded rightly. They had ceased to be owners some years before the trial, and neither had qualified as an expert. The rule that an owner of land or of personal property, in an action where the question is in issue, may give his estimate of its value, is inapplicable.        *Shea* v. *Hudson*, 165 Mass. 43. *Lincoln* v. *Commonwealth*, 164 Mass. 368, 380.

The record recites, that the plaintiff called the defendant as a witness and examined him. By G. L. c. 233, § 22, a party who calls the adverse party as a witness shall be allowed to cross-examine him; but when the defendant was called as a witness by his counsel, the trial judge ruled, that his counsel could not cross-examine him except as to the evidence given by him in his examination by the plaintiff, and the defendant excepted. The order of the introduction of evidence, and the limit of cross-examination, were within the discretion of the judge, and no error is shown. *Commonwealth* v. *Johnson*, 188 Mass. 382. *Walsh* v. *Feinstein*, 251 Mass. 109, 112. *Commonwealth* v. *Perry*, 254 Mass. 520. *Commonwealth* v. *Sacco*, 255 Mass. 369.

The defendant did not undertake to prove any assumption by Hewitt or himself of the mortgage debt at and after the sale to Hewitt, and whether Mr. Dexter, the plaintiff's counsel until 1917, informed Mr. Peters, who succeeded him as counsel, that the mortgage had been renewed for three years from August 28, 1915, was immaterial, and the exclusion of the defendant's offer to prove this alleged fact was right.

We have examined all of the exceptions argued, and the result is that the motion for a directed verdict could not rightly have been granted, and that the defendant's requests for rulings in so far as appropriate were sufficiently covered by the instructions. The exceptions to portions of the charge, when read with their context, which is full, also shows no reversible error.

*Exceptions overruled.*